IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA WRIGHT and KEVIN WEST, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 09-1567 |
| v. | ) ) | |
| OWENS CORNING, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

CONTI, District Judge.

On November 24, 2009, plaintiff Patricia Wright ("Wright") instituted this putative class action by filing a complaint against defendant Owens Corning ("Owens Corning" or "defendant"). (ECF No. 1.) On March 11, 2010, Wright filed an amended complaint and included Kevin West ("West," and together with Wright, "plaintiffs") as an additional named plaintiff. (ECF No. 22.) On June 29, 2010, plaintiffs filed a second amended complaint, which is the subject of the instant memorandum opinion. (ECF No. 49.) Waiting the court's determination is defendant's motion for summary judgment filed on July 19, 2010. (ECF No. 55.) Defendant's motion requests the court grant summary judgment in its favor with respect to all plaintiffs' claims because those claims were discharged in defendant's bankruptcy proceedings.

After considering defendant's motion for summary judgment, plaintiffs' brief in opposition (ECF No. 69), the joint statement of material facts ("J.S.") (ECF No. 76), and the

parties' other submissions, defendant's motion will be granted because plaintiffs' claims were discharged.

## *I. Factual background*

### *A. Wright's purchase of Owens Corning shingles and warranty claim*

In late 1998 or early 1999, Wright installed Owens Corning "Oakridge" shingles on her roof. (J.S., Part I, ¶ 1.) Wright did not purchase the shingles directly from Owens Corning; instead, she hired a contractor to purchase and install the shingles on her roof. (Id. ¶ 24.) Wright believed that the shingles she purchased through her contractor were protected by a 40-year warranty that provided non-prorated coverage for the first fifteen years. (J.S., Part II, ¶ 10.) Before the shingles were installed on the roof of her home, Wright obtained an Owens Corning product information brochure for Oakridge Shadow Premium Architectural Series Shingles at Lowe's or Home Depot which set forth the warranty period and non-prorated period. (Id. ¶ 11.) Wright alleges she did not receive a warranty registration card for the shingles. (Id. ¶ 12.)

In or around January 2009, Wright learned about problems associated with her Owens Corning shingles when she noticed water leaking in the four-seasons room of her home. (Id. ¶ 13.)[1] A roofing contractor inspected Wright's roof and advised her that all the shingles were cracked. (Id. ¶ 14.) Wright contacted Owens Corning by telephone in or about January 2009 regarding her leaking roof, and received a warranty claim packet from defendant dated January 13, 2009. (Id. ¶¶ 15-16.) Rosso Roofing completed the Owens Corning warranty claim form for a portion of the roof and submitted it to Owens Corning on Wright's behalf. (Id. ¶ 17.) During the warranty claims process, Owens Corning sent Wright a copy of a limited warranty on its roofing shingles. (Id. ¶ 18.) Owens Corning did not provide the limited warranty to Wright until

---

[1] Defendant disputes that the shingles were the cause of the leaking water, but does not consider the issue to be material to the determination of the instant motion. (J.S., Part II, ¶ 13.)

she instituted the warranty claims process, and the product information brochure was the only product documentation Owens Corning provided Wright at or before the purchase and installation of the shingles.  (Id. ¶ 19.)

Owens Corning refused to fully replace Wright's shingles; instead, defendant offered Wright $3,412.50 in compensation, plus a $500 credit toward the purchase of shingles.  (Id. ¶ 20.)  Wright replaced her roof in 2009 for $12,875.  (Id. ¶ 21.)

### B. West's purchase of Owens Corning shingles and warranty claim

In August 2005, West paid Howard Magnuson, a professional roofing installer, $10,824.50 to replace his roof with Owens Corning Oakridge Pro 30 shingles.  (Id. ¶ 1.)  In June 2009, West learned that he had problems with his Owens Corning roofing shingles when he noticed water leaking through the roof into his family room.  (Id. ¶ 2.)[2]  In July 2009, West made a warranty claim, alleging that, *inter alia*, his shingles were cracked and caused leaking in his family room ceiling.  (J.S., Part I, ¶ 26; Part II, ¶ 3.)[3]  West provided Owens Corning with pictures of the allegedly defective shingles and an estimate for replacement and repair which resulted in the creation of claim number 292-525 by Owens Corning.  (J.S., Part II, ¶ 4.)  Owens Corning provided West with a shingle warranty claim form and packet dated July 21, 2009.  (Id. ¶ 5.)  Owens Corning denied West's warranty claim in correspondence dated July 24, 2009, stating that the cracking problem with West's shingles was caused by deck movement.  (Id. ¶ 6.)  West was advised by a roofing inspector that the shingles on his roof, including the main, middle, and front porch roofs, exhibited signs of cracking and degranulation.  (Pls.' App. (ECF No. 69), Ex. B at 162.)

---

[2] Defendant disputes that the shingles were the cause of the leaking water, but does not consider the issue to be material to the determination of the instant motion. (J.S., Part II, ¶ 2.)
[3] Defendant avers that plaintiffs did not buy their shingles directly from Owens Corning and they did not contact Owens Corning until 2009. (J.S., Part I, ¶¶ 24, 27.)

### C. The reorganization plan, confirmation order, and published notice

On October 5, 2000, Owens Corning and several related entities (the "debtors")

voluntarily filed for bankruptcy relief under Chapter 11 in the United States Bankruptcy Court

for the District of Delaware. (J.S., Part I, ¶ 3.) On July 10, 2006, Owens Corning issued its sixth

amended joint plan of reorganization (the "reorganization plan"). (Id. ¶ 4.) On September 18,

2006, the bankruptcy court held a confirmation hearing, and on September 26, 2006, the

bankruptcy court issued an order confirming the reorganization plan (the "confirmation order").

(Id. ¶¶ 12-13.) The bankruptcy court entered findings of fact and conclusions of law with respect

to its confirmation order ("FOF/COL"). (Id. ¶ 19.)

Section 14.9 of the reorganization plan titled "Discharge of the Debtors" provides, *inter*

*alia*:

> (a) Except as otherwise provided herein or in the Confirmation
> Order, all consideration distributed under the Plan and the
> treatment of the Claims thereunder shall be, and shall be deemed to
> be, in exchange for, and in complete satisfaction, settlement,
> discharge, and release of, all Claims or other obligations, suits,
> judgments, damages, debts, rights, remedies, causes of action or
> liabilities (other than Demands) . . . relating to any of the Debtors
> or the Reorganized Debtors or their respective Estates . . . *and*
> *upon the Effective Date*, the Debtors and the Reorganized Debtors
> shall (i) be deemed discharged under Section 1141(d)(1)(A) of the
> Bankruptcy Code and released from any and all Claims or other
> obligations, suits, judgments, damages, debts, rights, remedies,
> causes of action or liabilities or Interests or other rights of an
> equity security holder of any nature whatsoever, including, without
> limitation, *liabilities that arose before the Confirmation Date* . . . .
>
> (b) *As of the Confirmation Date*, except as otherwise provided
> herein or in the Confirmation Order, all Persons shall be precluded
> from asserting against each of the Debtors, the Reorganized
> Debtors and their respective Related Persons any other or further
> Claims or other obligations, suits, judgments, damages, debts,
> Demands, rights, remedies, causes of action or liabilities or
> Interests or other rights of an equity security holder relating to any
> of the Debtors or the Reorganized Debtors or their respective

> Estates based upon any act, omission, transaction or other activity of any nature *that occurred prior to the Confirmation Date* . . . . [T]he Confirmation Order shall be a judicial determination of discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities (other than Demands) or Interest or other rights of an equity security holder against the Debtors or the Reorganized Debtors or their respective Estates and . . . such discharge shall void any judgment obtained against any of the Debtors or the Reorganized Debtors or their respective Estates at any time, to the extent that such judgment relates to a discharged Claim or terminated OCD interest.

(Def.'s App. (ECF No. 55), Ex. E at 162-63 (emphasis added).) Section 5.16(c) of the

reorganization plan titled "Releases by Holders of Claims and Interests" provides, *inter alia*:

> *Effective as of the Confirmation Date*, but subject to the occurrence of the Effective Date, for good and valuable consideration, to the fullest extent permissible *under applicable law*, each Person *that has held, currently holds or may hold* a Claim or other obligation, suit, judgment, damages, debt, right, remedy, cause of action or liability that is discharged or an Interest or other right of an equity security holder that is terminated, and each of their respective Related Persons, shall be deemed to completely and forever release, waive, void, extinguish and discharge all Released Actions . . . .

(Id. at 130 (emphasis added).) Section 14.11(a) of the reorganization plan titled "Special

Provisions for Warranty Claims, Distributorship Indemnification Claims, Product Coupon

Claims and Mira Vista Claims" provides, *inter alia*:

> The Debtors (or, as the case may be, the Reorganized Debtors) shall have the right after the Confirmation Date to fulfill any pre-Petition Date and pre-Confirmation Date warranty claims based on the Debtors' (or, as the case may be, the Reorganized Debtors') business judgment notwithstanding discharge of the Claims and release of the Debtors pursuant to the Bankruptcy Code and the Plan . . . .

(Id. at 164.) Section I, part D, of the confirmation order titled "Effects of Confirmation"

provides:

> In accordance with section 1141(a) of the Bankruptcy Code and
> Section 14.14 of the Plan, subject to Section I.C of this
> Confirmation Order and notwithstanding any otherwise applicable
> law, immediately upon the entry of this Confirmation Order, the
> terms of the Plan and this Confirmation Order shall be binding
> upon all Person, including the Debtors, the Reorganized Debtors,
> any and all holders of Claims, Demands or Interests (irrespective
> of whether such Claims or Interests are impaired under the Plan or
> whether the holders of such Claims or Interests accepted, rejected
> or are deemed to have accepted or rejected the Plan), any and all
> non-Debtor parties to executor contracts and unexpired leases with
> any of the Debtors and any and all Persons who are parties to or
> are subject to the settlements, compromises, releases, waivers,
> discharges and injunctions described herein, and in the Findings
> and Conclusions or in the Plan and the respective heirs, executors,
> administrators, trustees, affiliates, officers, directors, agents,
> representatives, attorneys, beneficiaries, guardians, successors or
> assigns, if any, of any of the foregoing.

(Def.'s App., Ex. G at 8-9.)

Owens Corning published notice of the bankruptcy proceedings, including the

confirmation and the resulting discharge, on several occasions: (1) notice of the general bar date

twice in the national and (if applicable) international editions of *The New York Times*, *The Wall

Street Journal* and *USA Today*; once in approximately 250 regional or local newspapers in the

areas in which the Debtors had significant business operations at the time of publication; and

once in approximately 35 trade publications in the primary lines of business in which the Debtors

operated (Def.'s App., Ex. J at 78);[4] (2) on June 16 through June 21, 2006, notice of the hearing

to consider the disclosure statement in *The Wall Street Journal* (U.S., Asia, and Europe editions),

*USA Today* (U.S. and international editions), *The New York Times* (U.S. and *International

Herald Tribune*), and the *Toledo Blade* (J.S., Part I, ¶ 23); (3) on August 1, 2006, general

publication notice in the United States to all unknown creditors and parties of interest in the

---

[4] Owens Corning avers in the joint statement of material facts that notice with respect to the general bar date was
published in March 2002. The exhibit to which Owens Corning refers, however, does not list any date with respect
to that notice. (*See* Def.'s App., Ex. J at 78.)

international edition of *USA Today* (Def.'s App., Ex. L at 2-3); and (4) on November 28, 2006,

notice of the entry of the confirmation order, the effective date, and the bar date for certain

administrative claims in *USA Today*, *The Wall Street Journal*, *The New York Times*, and the

*Toledo Blade* (J.S., Part I, ¶ 23).

## II. Standard of review

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . .
>
> **(c) Procedures.**
>
> **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that

> party's case, and on which that party will bear the burden of proof
> at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23).

> "[W]hen the moving party has carried its burden under Rule 56(c),
> its opponent must do more than simply show that there is some
> metaphysical doubt as to the material facts . . . .  Where the record
> taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).  A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

### III. Discussion

Plaintiffs assert a multitude of claims in their second amended complaint. Owens Corning does not address the efficacy of those claims in its summary judgment motion; rather, it argues that plaintiffs' claims are barred as a matter of law because <u>Jeld-Wen, Inc. v. Van Brunt</u> (<u>In re Grossman's Inc.</u>), 607 F.3d 114 (3d Cir. 2010) ("<u>Grossman's</u>"), changed the landscape of bankruptcy law in the Third Circuit regarding when a "claim," as that word is defined in the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* ("Bankruptcy Code"), exists for purposes of a bankruptcy case. It is important to review briefly the applicable caselaw that existed pre-<u>Grossman's</u> to appreciate how that decision is determinative in this case. The court will discuss the decision in <u>Grossman's</u> and consider whether those principles should retroactively apply to Owens Corning's 2006 bankruptcy proceedings, and whether plaintiffs' claims were discharged under the <u>Grossman's</u> framework. Finally, the court must determine whether Owens Corning's published notice satisfied the requirements of due process with respect to the named plaintiffs.

### A. *<u>In re M. Frenville Co.</u>*

The Court of Appeals for the Third Circuit in <u>Avellino & Bienes v. M. Frenville Co.</u> (<u>In re M. Frenville Co.</u>), 744 F.2d 332 (3d Cir. 1984) ("<u>Frenville</u>"), considered "whether the automatic stay provision [of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 362(a)(1) ("§ 362")] applie[d] to situations in which the acts of the debtor occurred before the filing of the bankruptcy petition yet the cause of action stemming from those acts arose post-petition." <u>Frenville</u>, 744 F.2d at 333. The court recognized that "[i]n most cases, the claim or cause of action will arise simultaneously with the underlying act. But to the extent that the harm is separated from the underlying conduct, at least for purposes of § 362(a), Congress has focused on the harm, rather than the act." <u>Id.</u> at 335. Under that theory, the court of appeals reasoned that unless the plaintiff "could have proceeded with its suit before bankruptcy petitions were

filed in July 1980, or had a claim against [the defendants] which arose before that date, the automatic stay [was] inapplicable.'" Id.

The court turned to the language of the Bankruptcy Code defining "claim," and determined that, despite Congress' "very broad" definition of that word, the phrase "right to payment" in 11 U.S.C. § 101 ("§ 101")[5] indicated Congress did not intend to "'confer the status of a claimant upon a petitioning creditor who has no right to payment.'" Id. at 336 (quoting In re First Energy Leasing Corp., 38 B.R. 577, 581 (Bankr. E.D.N.Y. 1984)). Focusing on the term "right to payment," the court turned to New York state law to determine when the plaintiffs' claim for indemnification or contribution against third parties accrued – either pre-petition or post-petition. Under state law, the plaintiffs' indemnity claims against the defendants did not accrue until after the third parties filed their suit, which occurred after the bankruptcy proceedings. The court held in Frenville that the plaintiffs' indemnification claim against the defendant "arose post-petition even though the conduct upon which [its] liability was predicated . . . occurred pre-petition." Grossman's, 607 F.3d at 119. The existence of a valid claim under the Frenville "accrual test" depended on "(1) whether the claimant possessed a right to payment; and (2) when that right arose" as determined by applicable state law. Kilbarr Corp. v. Gen. Servs. Admin. (In re Remington Rand Corp.), 836 F.2d 825, 830 (3d Cir. 1988); see Grossman's, 607 F.3d at 119.

---

[5] Section 101(5) defines a "claim" as a

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

The accrual test articulated in Frenville and followed within the Third Circuit was considered by other circuits to be "universally rejected," Cadleway Props., Inc. v. Andrews (In re Andrews), 239 F.3d 708, 710, n.7 (5th Cir. 2001), and described as "one of the most criticized and least followed precedents decided under the current Bankruptcy Code." Firearms Imp. & Exp. Corp. v. United Capitol Ins. Co. (In re Firearms Imp. & Exp. Corp.), 131 B.R. 1009, 1015 (Bankr. S.D. Fla. 1991); see Grossman's, 607 F.3d at 120 (citing numerous circuit, district and bankruptcy court decisions declining to follow Frenville).

## B. *Grossman's*

In June 2010, the Court of Appeals for the Third Circuit, sitting *en banc*, issued the Grossman's decision, which overturned Frenville and established a new test to determine when a claim exists for purposes of a bankruptcy proceeding.[6] This court must consider whether the principles in Grossman's with respect to a claim's existence are limited to asbestos-type claims, or whether those principles were meant to apply universally to any type of claim existing prior to a debtor's bankruptcy or confirmation of a reorganization plan. The court must also consider whether the new test in Grossman's is to be retroactively applied to this case.

In 1977, the plaintiff in Grossman's, Mary Van Brunt, remodeled her home, and purchased products that allegedly contained asbestos. Grossman's, 607 F.3d 117. She purchased the products from Grossman's, a home improvement and lumber retailer. Id. In April 1997, Grossman's filed for Chapter 11 bankruptcy protection under 11 U.S.C. §§ 1101 *et seq*. Id. In 2006, "Ms. Van Brunt began to manifest symptoms of mesothelioma, a cancer linked to asbestos exposure." Id.

---

[6] Pursuant to the Third Circuit Court of Appeals' internal operating procedure 9.1, no panel can overrule the holding in a precedential opinion or a previous panel unless the court considers the matter sitting *en banc*. See Jeld-Wen, Inc. v. Van Brunt (In re Grossman's), 607 F.3d 114, 116-17 (3d Cir. 2010).

In 2007, Ms. Van Brunt, along with her husband, filed an action for tort and breach of warranty in a New York state court against JELD-WEN, Grossman's successor-in-interest, "and fifty-seven other companies who allegedly manufactured the products that Ms. Van Brunt purchased from Grossman's in 1977." Id. "After the Van Brunts filed their suit, JELD-WEN moved to reopen the Chapter 11 case, seeking a determination that their claims were discharged by the Plan." Id. at 118. The United States Bankruptcy Court of the District of Delaware concluded that "the 1997 Plan of Reorganization did not discharge the Van Brunts' asbestos-related claims because they arose after the effective date of the Plan." Id. The bankruptcy court's holding relied on Frenville's accrual test, and the district court affirmed the bankruptcy court's order with respect to that issue. Id.[7]

On appeal, the court recognized that "'[s]ignificant authority [contrary to Frenville] exist[ed] in other circuits,'" id. at 120 (quoting Jones v. Chemetron Corp., 212 F.3d 199, 205-06 (3d Cir. 2000)), and considered whether Frenville's accrual test was still sound. Id. Courts declined to follow Frenville because its holding conflicted "with the Bankruptcy Code's expansive treatment of the term 'claim.'" Id. at 121. The House and Senate Reports concerning the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978), made explicit that "'[b]y this *broadest possible definition* [of the term 'claim'] . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case . . . [and] permits the broadest possible relief in the bankruptcy

---

[7] The district court held that, under New York state law, "the Van Brunts' breach of warranty claims accrued prepetition and were discharged as part of the Grossman's bankruptcy," because the applicable four-year statute of limitations began to run "when delivery of the product [was] tendered . . . ." Jeld-Wen, Inc. v. Van Brunt (In re Grossman's), 400 B.R. 429, 432 (D. Del. 2009). In this case, plaintiffs' claims for breach of implied warranty under Pennsylvania law may have been discharged – even under the Frenville accrual test – because delivery of the roofing shingles were tendered more than four years prior to this action. See 13 PA. CONS. STAT. § 2725(a) and (b); Antz v. GAF Materials Corp., 719 A.2d 758, 760 (Pa. Super. Ct. 1998).

court.'" Id. (quoting H.R. Rep. No. 95-595, at 309); see FCC v. NextWave Pers. Commc'ns Inc., 537 U.S. 293, 302 (2003) (noting the word "claim" has the broadest available definition).

The court of appeals in Grossman's rejected Frenville's reliance on the term "right to payment" in the Bankruptcy Code because it failed "to give sufficient weight to the words modifying it: 'contingent,' 'unmatured,' and 'unliquidated.'" Id. In other words, the court's decision in Frenville did not acknowledge that a "claim" "can exist under the Bankruptcy Code *before* a right to payment exists under state law." Id. (emphasis added). Under that analysis, the court explicitly overruled Frenville and its accrual test because Frenville imposed "too narrow an interpretation of a 'claim' under the Bankruptcy Code." Id.

The court of appeals recognized that its decision to overrule Frenville left a void in the court's jurisprudence about when a claim exists under the Bankruptcy Code. Id. Mindful of "Congress' intent to provide debtors with a fresh start" after claims are discharged pursuant to confirmation of a reorganization plan, see 11 U.S.C. § 1141(d)(1)(A), the court established a new test to determine when such an event occurs. Id. at 122. The court considered settled caselaw in other circuits, including the "conduct test" and the "pre-petition relationship test." Id. The conduct test enabled "individuals to hold a claim against a debtor by virtue of their potential future exposure to 'the debtor's product,' regardless of whether the claimant had any relationship or contact with the debtor." Id. at 123 (quoting Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft Corp.), 58 F.3d 1573, 1577 (11th Cir. 1995)). The court in Grossman's acknowledged that the conduct test was too broad and could encompass claimants "'who did not use or have any exposure to the dangerous product until long after the bankruptcy'" proceedings. Id. (quoting Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. PA. L. REV. 2045, 2071 (2000)).

The *en banc* panel found that the decision issued by the Court of Appeals for the Eleventh Circuit in Piper was persuasive. The test articulated in Piper, the pre-petition relationship test,[8] or the "Piper test," logically balanced the Bankruptcy Code's definition of "claim," and the parties' expectations during bankruptcy proceedings. The Court of Appeals for the Eleventh Circuit stated:

> [A]n individual has a § 101(5) claim against a debtor manufacturer if (i) events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product.

Piper, 58 F.3d at 1577. Cognizant of the Piper test, the court concluded in Grossman's that "a prerequisite for recognizing a 'claim' is that the claimant's exposure to a product giving rise to the 'claim' occurred pre-petition, even though the injury manifested itself after the reorganization." Grossman's, 607 F.3d at 125. The court held that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." Id. Applying its holding to the Van Brunts, the court decided that "their claims arose sometime in 1977, the date Mary Van Brunt alleged that Grossman's product exposed her to asbestos." Id.

Plaintiffs' argument that the holding in Grossman's is limited to asbestos-related cases is unconvincing. The court's decision did not include any language limiting its holding in that way.[9] (See Pls.' Br. (ECF No. 69) at 2.) Notably, the court recognized that, after overruling

---

[8] Under the pre-petition relationship test, a claim arises from a debtor's conduct "where there is . . . some pre-petition relationship between the debtor and the claimant, such as a purchase, use, operation of, or exposure to the debtor's product." Grossman's, 607 F.3d at 123 (citing Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft, Corp.), 58 F.3d 1573, 1576 (11th Cir. 1995)).

[9] Plaintiffs point to footnote eleven in the Grossman's decision to support their argument that Grossman's only applies to asbestos-related claims. In footnote eleven, the court of appeals declined to "decide when a 'claim' arises in the context of an environmental cleanup case involving conflicting statutory frameworks." Grossman's, 607 F.3d at 125-26 n.11. It does not follow that the court refused to articulate a standard for all other claims. The court

Frenville, it was tasked with filling a void in its jurisprudence about when a claim arises. To limit its holding to asbestos cases would undoubtedly fall short of filling that void.[10] Indeed, one recent decision by the Court of Appeals for the Third Circuit applied the holding in Grossman's irrespective of the existence of a product claim. See In re Rodriguez, 629 F.3d 136, 142 (3d Cir. 2010) (holding that, under Grossman's, a mortgagee's right to collect successfully escrow payments existed pre-petition, and thereby constituted a "claim" under § 101(5)).[11] Because the holding in Grossman's applies to claims – like those asserted by plaintiffs – involving, *inter alia*, breach of warranty and product liability regarding roofing shingles, the court must decide whether the holding in Grossman's can be retroactively applied to this case.

### *1. Retroactively applying Grossman's*

In Harper v. Virginia Department of Taxation, 509 U.S. 86 (1993), the Supreme Court of the United States held that

> [w]hen [the] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule.

---

singled out one area of the law which had competing statutory frameworks. In other situations, there is no principled basis for not extending the new rule.

[10] It deserves reiterating that the Frenville decision involved an indemnity claim. If the court of appeals in Grossman's intended to carve out a rule for asbestos-related claims, overruling Frenville would not have been necessary.

[11] Plaintiffs cite In re G-I Holdings, Inc., Nos. 01-30135, 01-38790, 2010 WL 5690394 (Bankr. D.N.J. Dec. 14, 2010), for the proposition that Grossman's does not apply to claims outside the asbestos context. Plaintiffs' reliance on G-I Holdings is misplaced. In that case, the court did not need to address the issue raised here because it reasoned that Grossman's was inapplicable. The plaintiff filed its proof of claim before the bar date, "and the claim was included in the Plan that was confirmed." Id. at *18. The claim in issue in G-I Holdings was also arguably "an environmental cleanup claim," which Grossman's declined to address. See Grossman's, 607 F.3d at 125 n.11. Here, plaintiffs did not initiate their lawsuit until 2009 – approximately three years *after* Owens Corning's reorganization plan was confirmed by the bankruptcy court – and their claims cannot be classified as environmental cleanup claims.

Id. at 97. In reaching its decision, the Court opined that "[n]othing in the Constitution alters the fundamental rule of 'retrospective operation' that has governed '[j]udicial decisions . . . for near a thousand years.'" Id. at 94 (quoting Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372 (1910)).

In the civil context, the Court had previously carved out a limitation to this rule if "the denial of retroactive effect to 'a new principle of law,'" id., would avoid "'injustice or hardship'" without retarding the operating of the new rule in question. Chevron Oil Co. v. Huson, 404 U.S. 97, 107 (1971) (abrogated by Harper, 509 U.S. 86 (1993)).[12] The Court in Harper took issue with this exception and noted its ruling made clear that "'the Chevron Oil test cannot determine the choice of law by relying on the equities of the particular case' and that the federal law applicable to a particular case does not turn on 'whether [litigants] actually relied on [an] old rule [or] how they would suffer from retrospective application' of a new one." Harper, 509 U.S. at 95 n.9 (quoting James B. Beam Distilling Co. v. Georgia, 501 U.S. 529 (1991)); see Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cnty., 112 F.3d 652, 672 (3d Cir. 1997) (Harper "overruled Chevron Oil's equitable balancing test as the determinant of whether a new principle of law will be applied retroactively"). The Court "reasoned that 'the nature of judicial review' strips [the Court] of the quintessentially 'legislat[ive]' prerogative to make rules of law retroactive or prospective as [the Court] see[s] fit." Id. at 95 (quoting Griffith v. Kentucky, 479 U.S. 314, 323 (1987)).

In light of those principles, the Court concluded that "a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by

---

[12] Under the Chevron Oil framework, courts were to consider whether a ruling should apply in a purely prospective fashion. Kolkevich v. Attorney General, 501 F.3d 323, 338 n.9 (3d Cir. 2007). The Chevron Oil test required courts to consider three factors: (1) whether the decision to be applied nonretroactively established a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether retrospective operation would further or retard the new rule's operation; and (3) whether the equities cut in favor of prospective application. Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07 (1971); see Kolkevich, 501 F.3d at 338 n.9.

all courts adjudicating federal law," id. at 96, and extended "'to other litigants whose cases were not final at the time of the [first] decision.'" Id. (quoting Beam, 501 U.S. at 544 (White, J., opinion concurring in judgment)).

Courts have not hesitated to extend Beam and Harper's principles to decisions outside the Supreme Court's purview.  See United States v. Goodner Bros. Aircraft, Inc., 966 F.2d 380, 385 (8th Cir. 1992) (applying the principles from Beam, the court gave retroactive effect to a decision from a sister circuit to the parties before it because "full retroactivity is the normal rule in civil cases" and Chevron Oil was a test for prospectivity); Sterling v. Block, 953 F.2d 198, 199 (5th Cir. 1992) (because the holding in the court of appeal's prior decision was applied retroactively to the parties in that case, it applied retroactively in the case *sub judice*); Ashley v. Cunningham, No. 99-506, 2002 WL 655486, at *2 (D. Del. Apr. 10, 2002) (applying a new rule of law handed down by the Court of Appeals for the Third Circuit retroactively after considering Harper); see also Laborer' Int'l Union of North Am. v. Foster Wheeler Corp., 26 F.3d 375, 386 n.8 (3d Cir. 1994) (noting that, although Beam  and Harper "dealt with decisions issued by the Supreme Court, given the *ratio decidendi* of both cases . . . there [was] no cogent basis for distinguishing decisions handed down by the inferior federal courts").

The court of appeals in Grossman's applied its new rule of law to the Van Brunts and concluded that their personal injury claims existed when they purchased the products containing asbestos from Grossman's in 1977.  Grossman's, 607 F.3d at 125.  Similarly, the court of appeals' December 2010 decision in Rodriguez applied Grossman's retroactively to bankruptcy proceedings in 2007, and determined that the claim of the mortgagee ("Countrywide") for unpaid escrow payments existed pre-petition.  Rodriguez, 629 F.3d at 142.  The mortgagors (the "Rodriguezes") in Rodriguez filed for relief under Chapter 13 of the Bankruptcy Code on

October 10, 2007.  Id. at 137.  On December 2, 2007, the Rodriguezes "filed a motion in the

Bankruptcy Court to enforce the automatic stay pursuant to 11 U.S.C. § 362(a) [("§ 362(a)")] . . .

."  Id.  On January 15, 2008, Countrywide filed its proof of claim.  In re Rodriguez, 391 B.R.

723, 725 (Bankr. D.N.J. 2008).[13]  After reviewing the court's definition of "claim" in

Grossman's, the court determined in Rodriguez that Countrywide's right to collect "funds to

satisfy an escrow item for which there [was] a deficiency," existed pre-petition – despite the

claim's contingent or remote nature – for purposes of § 101(5), and that claim was not barred by

the automatic stay provisions of § 362(a).

        While those decisions did not explicitly rely upon Harper or Beam, it is obvious that this

court under the relevant caselaw must apply Grossman's retroactively to this case, which was not

final at the time Grossman's was decided.[14]

        Wright's claims in this case existed pre-petition (i.e., at or before the time Owens

Corning filed its Chapter 11 bankruptcy petition in 2000) because she purchased and installed in

1999 – pre-petition – the Owens Corning shingles which gave rise to her claim asserted in 2009.

Wright's purchase of the shingles occurred before 2000, and the conduct giving rise to the injury,

i.e., the alleged manufacturing defects in the shingles, existed at the time she purchased and

installed the shingles.  Whether she was unaware of the defects until the injury manifested itself

in 2009 is irrelevant under the Grossman's standard.  Wright's claims arose from the pre-petition

relationship between Wright and Owens Corning.

---

[13] The bankruptcy court's findings of fact concerning the date Countrywide filed its proof of claim differs from the
date listed in the court of appeals' decision.  See In re Rodriguez, 629 F.3d at 138.
[14] Plaintiffs assert that Owens Corning's bankruptcy case is not "open" and Harper and its progeny do not apply.
Plaintiffs' argument falls flat because in Grossman's and Rodriguez, the court of appeals retroactively applied the
new rule of law to bankruptcy proceedings that were complete, i.e., were not open.  This court sees no distinction
between the bankruptcy proceedings in those cases and the proceedings relevant to Owens Corning that warrants a
different result.

West's claims present a more challenging issue: whether the post-petition purchase and installation of Owens Corning shingles in 2005 gave rise to a claim that existed pre-confirmation in 2006. The court of appeals in Grossman's was not confronted with the issue whether a claim arising from a post-petition, pre-confirmation relationship can be discharged under a court's reorganization plan. Grossman's established the test to determine when a claim exists. That test is logically extended to determine whether a claim arises pre-confirmation. Here, under that test, it is clear that for purposes of the Bankruptcy Code West's claims arose in 2005.

The court in Grossman's relied upon the Piper test to formulate a cogent standard for determining when a claim arises. See Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.), No. 02-16131, 2011 WL 766661, at *8 n.7 (Bankr. S.D.N.Y. Feb. 25, 2011) (new Grossman's test "is essentially the same test adopted in Piper). The Piper test, however, is not limited to pre-petition relationships. The Court of Appeals for the Eleventh Circuit explained that its "modified test" changed "the focal point of the relationship from the petition date to the confirmation date," so that the test would "encompass . . . injuries occurring post-petition but pre-confirmation, consistent with the policies underlying the Bankruptcy Code." Piper, 58 F.3d at 1577-78 n.5. Indeed, the Bankruptcy Code provides, in relevant part, that the confirmation of a plan of reorganization "discharges the debtor from any debt that arose *before the date of such confirmation* . . . ." 11 U.S.C. § 1141(d)(1)(A); see Grossman's, 607 F.3d at 122; see also Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995) (generally, confirmation of a debtor's reorganization plan discharges all pre-confirmation claims against the debtor). To that end, the panel in Grossman's directed courts to consider, *inter alia*, whether a claimant has "a colorable claim at the time of the bar date," in determining "[w]hether a particular claim has been discharged by a plan of reorganization . . . ." Grossman's, 607 F.3d at 127.

West's relationship to Owens Corning product occurred pre-confirmation. Applying the principles delineated in <u>Grossman's</u>, <u>Piper</u>, and the policies underlying the Bankruptcy Code, the court concludes that West's claims arose in 2005 at the time he purchased and installed the allegedly defective product.

### 2. Discharge under the Reorganization Plan

Because plaintiffs' claims existed pre-petition – Wright's claims – or pre-confirmation – West's claims, the court must decide whether their claims were discharged under the reorganization plan.[15] The reorganization plan provides that "all consideration distributed under the Plan . . . shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims . . . relating to any of the Debtors or the Reorganized Debtors or their respective Estates . . . ." (Def.'s App., Ex. E at 162.)[16]

> [A]ll Persons shall be precluded from asserting against each of the Debtors, the Reorganized Debtors and their respective Related Persons any other or further Claims . . . relating to any of the Debtors or the Reorganized Debtors or their respective Estates based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date . . . .

(<u>Id.</u> at 163.)

In the confirmation order, the bankruptcy court, consistent with 11 U.S.C. § 1141(a), unequivocally provided that all claims arising before the confirmation date were discharged. (<u>See</u> Def.'s App., Ex. G at 8-9.) Because plaintiffs' claims arose pre-confirmation, they were discharged pursuant to the confirmation order.[17]

---

[15] The court in <u>Grossman's</u> did not reach the issue whether the Van Brunt's claims were discharged. <u>Grossman's</u>, 607 F.3d at 127 ("Whether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case and is best determined by the appropriate bankruptcy court or the district court.").

[16] Notably, the reorganization plan adopted the Bankruptcy Code's definition of "claim" under § 101(5). (<u>See</u> Def.'s App., Ex. E at 11-12.)

[17] Plaintiffs suggest that a claims representative should have been appointed during Owens Corning's bankruptcy proceedings to protect the interests of future unknown creditors who did not receive adequate notice. (<u>See</u> Pl.'s Supplemental Mem. (ECF No. 81) at 9.) While federal courts are not required to appoint representatives for all

## C. Published notice and due process

Finding that the plaintiffs' claims were discharged in 2006 does not complete the inquiry; the court must determine whether the notice by Owens Corning of the bankruptcy proceedings was sufficient to protect the plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the Constitution.

"For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'" Chemetron, 72 F.3d at 346 (citing Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.), 125 B.R. 650, 654 (Bankr. M.D. Fla. 1991)).  Known creditors are entitled to actual written notice, while due process for unknown claimants is generally satisfied through notification by publication.  Id.  A known creditor is "one whose identity is either known or 'reasonably ascertainable by the debtor.'"  Id. (quoting Tulsa Prof'l Collection Serv., Inc. v. Pope, 485 U.S. 478, 490 (1988)).  An unknown creditor is an individual "whose interests are either conjectural or future, or although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]."  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317 (1950).

"A creditor's identity is 'reasonably ascertainable' if that creditor can be identified through 'reasonably diligent efforts.'"  Id. (quoting Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798 n.4 (1983)).  Reasonable diligence does not require a debtor to conduct "'impracticable and extended searches . . . in the name of due process.'"  Id. (quoting Mullane,

---

potential litigants, Jones v. Chemetron Corp., 212 F.3d 199, 210 (3d Cir. 2000) (in a Chapter 11 reorganization, a bankruptcy court is not required to *sua sponte* appoint a representative to deal with future interests if no request is made), it is noteworthy that Owens Corning and the debtors subject to the bankruptcy proceedings clearly contemplated the types of claims asserted by plaintiffs and the method by which to provide a remedy.  Section 14.11(a) of the reorganization plan provides the debtors the right, after the confirmation date, to fulfill any pre-petition date and pre-confirmation date warranty claims notwithstanding discharge of the claims and release of the debtors pursuant to the Bankruptcy Code and the reorganization plan.  Pursuant to that section, Owens Corning offered Wright a settlement figure, albeit not the full cost to replace the shingles.  Section 14.11(a) is evidence that the parties to the bankruptcy contemplated instances where warranty claims of future unknown creditors could be resolved, even though the claims were discharged in the bankruptcy.

339 U.S. at 317).  To that end, "[a] debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.'"  Id. (quoting Charter, 125 B.R. at 654).  Efforts beyond a careful examination of a debtor's own books and records are generally not required.  Id. at 347.

For unknown claimants or creditors, it is well established that "constructive notice of the bar claims date by publication satisfies the requirements of due process."  Id. at 348 (holding that notice published in the *New York Times* and the *Wall Street Journal* was sufficient to satisfy due process owed to unknown creditors); see Brown v. Seaman Furniture Co., 171 B.R. 26, 27 (Bankr. E.D. Pa. 1994) (notice by publication satisfies due process with respect to potential creditors when the notice appears in national publications and in newspapers of general circulation in areas where the debtor did business).

Here, plaintiffs, in their supplemental briefing following oral argument, raise a question about whether they were known creditors to Owens Corning during the bankruptcy proceedings and were therefore entitled to something more than constructive notice via publication.  (See Pl.'s Supplemental Mem. (ECF No. 81) at 13.)  It is undisputed that the shingles were purchased through third-party contractors and plaintiffs first contacted Owens Corning in 2009.  Plaintiffs do not point to any evidence suggesting how Owens Corning, through a reasonably diligent search of its books or records, could have discovered plaintiffs' identities prior to the confirmation of the reorganization plan.  It is impractical to suggest Owens Corning search out every conceivable third-party contractor who purchased shingles to determine on which homes those shingles were installed and discover the identity of those home-owners.  The kind of searches suggested by plaintiffs go beyond what is required under Mullane, Chemetron, and their

progeny.  See Mullane, 339 U.S. at 317; Chemetron, 72 F.3d at 346; see also 3 ALAN N. RESNICK & HENRY J SOMMER, COLLIER ON BANKRUPTCY § 342.02[3] (16th ed. 2010) (citing Chemetron).

Owens Corning published notice of the bankruptcy proceedings, including the bar claims date and the entry of the confirmation order, in *The New York Times*, *The Wall Street Journal* and *USA Today*, as well as 250 regional or local newspapers in areas where Owens Corning had significant business operations at the time of publication, and in approximately 35 trade publications in the primary lines of business operated by Owens Corning.  See supra pp. 6-7. Under Chemetron, the published notice in this case satisfied Owens Corning's duty to unknown creditors, including plaintiffs, because all relevant matters regarding the bankruptcy proceedings were published in local, national, and international publications.[18]

## IV. Conclusion

Because plaintiffs' claims against Owens Corning arose prior to the time the confirmation order was entered in 2006, those claims were discharged.  The published notice was sufficient to satisfy the requirements of due process.  No reasonable jury could conclude that there is any genuine issue of material fact for this case to proceed to trial.  Owens Corning's motion for summary judgment must be granted.  An appropriate order shall follow.

---

[18] Plaintiffs rely upon Pettibone Corp. v. Payne (In re Pettibone Corp.) 151 B.R. 166 (N.D. Ill 1993), for the proposition that a confirmation order cannot discharge claims of creditors when notice is deficient.  The bankruptcy court held in Pettibone that the notice was deficient because it only addressed claims arising pre-petition, but was silent on claims –including those asserted by the plaintiff - that concerned post-petition, pre-confirmation injuries. Id. at 170-71.  In this case, under Grossman's, plaintiffs' claims existed pre-confirmation and, unlike in Pettibone, there was notice by publication of the confirmation process.  In Pettibone, the bankruptcy court did not consider the plaintiff's claim to have existed pre-petition; rather, it may have been a post-petition claim.  The notice sent in Pettibone only went to pre-petition claimants.  Plaintiffs do not demonstrate *why* the publication notice in this case was constitutionally deficient.  Without more, this court, while it is possible to argue more extensive notice could have been undertaken, i.e., searching for names and addresses of contractors to find purchasers like plaintiffs, cannot discern that the notice sent by publication was constitutionally deficient.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 21, 2011